UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ROGER DEAN CORDELL

      Petitioner,

-vs-                       Case Nos.    5:05-cv-258-Oc-10GRJ
                                                         5:04-cr-15-Oc-10GRJ

UNITED STATES OF AMERICA

      Respondent.

_____/

## REPORT AND RECOMMENDATION[1]

      This matter is before the Court on the Order of Reference (Doc. 8), which referred to the undersigned, Defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By a Person In Federal Custody. (Doc. 1.)  After the United States filed a response to Defendant's motion (Doc. 13) the Court conducted an evidentiary hearing and, accordingly, this matter is now ripe for decision.[2]  For the reasons discussed below the Petitioner's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct  Sentence is due to be **DENIED**.

## I.  BACKGROUND AND FACTS

      Petitioner was indicted in a one count indictment charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. §636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] The Court appointed counsel to represent the Petitioner at the evidentiary hearing. (Doc. 14.)

Petitioner entered a guilty plea on June 22, 2004 without a written plea agreement. On January 27, 2005, Petitioner was sentenced to 60 months of imprisonment. Petitioner did not file a direct appeal.

On June 1, 2005, the Petitioner filed the instant *pro se* Petition To Vacate, Set Aside or Correct Sentence making a number of claims and arguments, all of which, except one, are either legally frivolous or facially refuted by the record. The one claim that required an evidentiary hearing was Petitioner's claim that he received ineffective assistance of counsel because his CJA appointed attorney failed to file an appeal despite being requested to do so. Based on this allegation, the Petitioner requests the Court to vacate his sentence to permit him to file a timely appeal.

Accordingly, the Court set an evidentiary hearing on the limited issue of Defendant's claim of ineffective assistance of counsel concerning his counsel's alleged failure to file a notice of appeal despite his request that his counsel do so.  At the evidentiary hearing the Defendant testified in his own behalf.[3] The United States presented the testimony of Assistant Federal Public Defender, Rick Carey, Petitioner's trial counsel in the underlying criminal case.

The Petitioner testified that he was sentenced on June 22, 2004. Petitioner stated that during the course of his representation by Mr. Carey he did not believe he

---

[3] The Defendant testified via videoconference from the BOP facility where he is being held in Massachusetts. The Court set the hearing via videoconference in order to expedite resolution of the matter, which previously had been scheduled for hearing several times but was cancelled due to serious medical conditions of the Petitioner, which prevented him from traveling. Although this proceeding involves a habeas claim under §225 and is, therefore, a civil matter and not a criminal matter that does not implicate the confrontation clause under the Sixth Amendment, the Court, nonetheless, advised the parties of its intention to conduct the hearing via videoconference and granted the parties an opportunity to file objections. (Doc. 28.) Neither party filed any objections and Petitioner filed a notice representing that he had no objection and indeed consented to the hearing being conducted via videoconference. (Doc. 29.)

had the opportunity to discuss the case with Mr. Carey other than "just brief talking." According to Petitioner, after he was sentenced he never discussed with Mr. Carey Petitioner's right to appeal. Petitioner stated that he learned of his right to appeal at the sentencing when he was advised of his right to appeal by the Court.

Petitioner testified that on the day he was sentenced he had a discussion with Mr. Carey in the corridor outside of the courtroom directly after he was sentenced. According to Petitioner, he told Mr. Carey that he "wanted to appeal because ... [he] shouldn't be going to prison for ten years ..." Petitioner testified that in response to this statement, Mr. Carey said "[t]hey get you for constructive, however the weapon, constructive ..." In response to Mr. Carey's statement Petitioner said "[w]ell, I want to appeal." Mr. Carey then told Petitioner "[I] don't think there's anything to appeal it on" to which Petitioner replied "I want it appealed."

Petitioner further testified that he talked to Mr. Carey again and was told there was "[n]o way to keep from going [to prison] the only way to keep from going to prison is to help the government with some cases so I did and I wasn't supposed to be going to prison, I was supposed to be in-house arrest." Petitioner further testified that Mr. Carey never filed a notice of appeal even though Petitioner believed he had grounds. According to Petitioner those grounds included: "ineffective counsel - I felt abandoned by my attorney," "there was a reason for the weapon being in the home," and arguments based upon *Booker* and *Fanfan.*

On cross-examination, Petitioner admitted that before he pled guilty he went to Mr. Carey's office twice and spoke to him about his case. Moreover, Petitioner testified that prior to his guilty plea he was cooperating with ATF Special Agent DeWayne

3

Krueger with the expectation that he would receive a lesser punishment because of his cooperation. At sentencing the United States filed a motion to reduce Petitioner's sentence due to his cooperation. Pursuant to the Government's recommendation at sentencing the Court reduced Defendant's base offense level by two levels. Notably, the Petitioner admitted on cross examination that after sentencing Mr. Carey advised him that Petitioner needed to continue to cooperate in order to reduce his sentence further. Based upon this advice the Petitioner continued to cooperate with the Government even after sentencing.

The United States presented the testimony of Rick Carey an Assistant Federal Public Defender responsible for the Ocala Division during the preceding six years. Mr. Carey has been practicing criminal law for approximately twenty-five years and is a highly experienced and seasoned federal practitioner. Between approximately 1983 and 1989 Mr. Carey served as an Assistant State Attorney in Ocala. In 1989 Mr. Carey was appointed as an Assistant United States Attorney in the Southern District of Florida where he served in the Miami office until August of 2000 when he was appointed as an Assistant Federal Public Defender in the Middle District of Florida, stationed in Ocala.

Since Mr. Carey was appointed as an Assistant Federal Public Defender, it is his customary practice to document "every meeting, every phone call, every time [he] has a conversation with anybody, be it law enforcement, be it with [his] client, be it with [his] client's family ... " in a log book.  Mr. Carey  makes a notation in the log book of the time a call came in, the name of the client involved in the call and a brief synopsis of the nature of the conversation. Further, in those instances in which the telephone call is with the client, it is Mr. Carey's customary practice to make a notation with a red star next to

4

the entry to denote that he actually communicated with the client. According to Mr. Carey, he followed these procedures with regard to his representation of Petitioner in the underlying criminal case.

As evidenced by Mr. Carey's phone log, his first contact with Petitioner's case was on May 26, 2004 at 4:00 p.m. At that time he had a telephone conversation with a lawyer who represented Mr. Cordell in a state case that was then pending in which Mr. Cordell was charged with dealing in stolen property. Mr. Carey was advised there were no depositions taken in the state case and that the state case had resulted in the federal indictment. On May 27, 2004 Mr. Carey contacted Joe Palmer, the chief investigator for his office, to conduct an investigation. Later that day, Mr. Palmer telephoned Mr. Carey and advised him that Palmer would meet personally with the lawyer handling Mr. Cordell's state case to obtain any pertinent information that would be helpful in the federal prosecution.

On June 2, 2004 Mr. Cordell met with Mr. Carey at Mr. Carey's office for about an hour and a half. During this meeting, Mr. Carey discussed with Mr. Cordell, the discovery Mr. Carey had received from the Government at the arraignment, the facts of the case, and reviewed with Mr. Cordell his extensive criminal history. According to Mr. Carey, the facts were not complex. A search warrant had been executed on the residence and during the execution of the warrant law enforcement found a firearm in  a table drawer. The government had evidence that a family member had sold the firearm to Cordell.

Mr. Carey told Cordell that the case was not "close" and that based upon the evidence he had reviewed Mr. Carey believed there was enough evidence to show that

5

Mr. Cordell was in knowing possession of a firearm or at a minimum, constructive possession of a firearm. Mr. Carey told Mr. Cordell at that conference that in Mr. Carey's opinion the Government would prevail at trial based upon the evidence produced by the Government. Further, Mr. Carey told Mr. Cordell that it was not a good idea for Cordell to subject himself to cross-examination at trial because of Mr. Cordell's prior criminal history. Mr. Carey explained that one of his main concerns was that the Court did not find Cordell to be an armed career criminal, which would have subjected Cordell to a minimum mandatory term of imprisonment of fifteen years.

Accordingly, to proceed towards a change of plea, on June 4, 2004 Mr. Carey spoke with the prosecutor to discuss whether the Government would agree to a plea that would permit Cordell to withdraw his plea of guilty in the event he was deemed an armed career criminal. On June 8, 2004 Mr. Carey was advised by the prosecutor that Cordell was not an armed career criminal.

On June 17, 2004 Mr. Carey had a telephone conversation with Mr. Cordell regarding the change of plea and advised Cordell that the change of plea hearing was scheduled for June 22, 2004. On June 22, 2004 Cordell entered a "straight-up" guilty plea to the charge of possession of a firearm by a convicted felon.

After the guilty plea Mr. Cordell began to cooperate with the Government in an effort to reduce his anticipated sentence. On August 16, 2004 Mr. Cordell telephoned Mr. Carey and advised him that a confidential informant was harassing him. Mr. Carey advised Cordell immediately to contact Special Agent Kreuger of the ATF. Mr. Carey knew that Cordell was actively cooperating with the Government and through his cooperation he had a working relationship with Agent Kreuger.

6

On or around August 25, 2004 Mr. Carey received the presentence investigation report from probation. Mr. Carey telephoned the probation officer to discuss and confirm that the Defendant only had two and not three prior felony convictions, which was critical to the determination of whether the Defendant would be considered an armed career criminal, in which case Mr. Carey would have filed a motion to withdraw the guilty plea. Because Mr. Cordell was actively cooperating with the Government, Mr. Carey requested a continuance of the September 2004 sentencing hearing so that Cordell's cooperation could bear fruit that would benefit Cordell at sentencing. The sentencing hearing was rescheduled for November 15, 2004.

On September 13, 2004 Mr. Carey had another telephone conversation with Mr. Cordell regarding the presentence investigation report ("PSI".). Mr. Cordell advised Mr. Carey that he disagreed with paragraph 57 of the PSI which had assessed Mr. Cordell two additional points because it was alleged that Cordell was on probation when the criminal conduct occurred. Mr. Carey had several subsequent telephone conversations with the probation officer and Mr. Cordell concerning this issue.

Sentencing was continued again to December 17, 2004, this time upon motion of the United States. Prior to the scheduled sentencing in December Mr. Carey had several telephone conversations with Mr. Cordell concerning whether the Court would permit Mr. Cordell to voluntarily surrender and the logistics of obtaining medical records of Mr. Cordell's cardio-pulmonary medical problems that Mr. Carey intended to use to file a further motion for downward departure pursuant to U.S.S.G. § 5H1.4. Because Mr. Carey was unable to obtain the medical reports prior to the sentencing hearing he filed a motion to continue. The sentencing hearing was rescheduled for January 19, 2005.

7

In January 2005 Mr. Carey discussed the sentencing hearing with the prosecutor and the prosecutor agreed not to object to the use of medical reports at the sentencing hearing in lieu of live medical testimony. On the day before the sentencing hearing Mr. Cordell telephoned Mr. Carey to inquire whether a house arrest could be transferred to Tennessee if the Court was to sentence Mr. Cordell to house arrest. Mr. Carey advised Mr. Cordell that house arrest normally can be transferred to another district. However, Mr. Carey did not promise Mr. Cordell in this telephone conversation - nor in any prior conversation - that Mr. Cordell would receive house arrest as a sentence. Rather, Mr. Carey told Mr. Cordell that he could ask for that and that Mr. Carey had previously obtained a sentence of house arrest for a critically ill criminal defendant in a drug case but that the defendant in that case was elderly and was in criminal history category one. Mr. Carey asked Mr. Cordell whether he wanted Mr. Carey to ask for house arrest and Mr. Carey advised that he would.

At the sentencing hearing on January 19, 2005, Mr. Carey presented the medical evidence to the Court documenting Mr. Cordell's medical issues. At sentencing Mr. Cordell received the benefit of a 5K.1 motion filed by the Government and as a result received a sentence of 60 months well below the guideline range of 70 to 87 months.

According to Mr. Carey, he did not have any discussion with Mr. Cordell immediately after the sentencing. Indeed, Mr. Carey expressly recalled that he did not meet with Mr. Cordell immediately after sentencing - as Mr. Cordell testified - because on that day Mr. Carey's boss, Fletcher Peacock was with Mr. Carey and they were in a hurry to leave so that Mr. Peacock could drive back to his office in Orlando. Mr. Carey instead told Mr. Cordell to call Mr. Carey the next day to discuss the case in view of the

8

fact that Mr. Cordell was not in custody because his request to voluntarily surrender was granted by the Court.

According to Mr. Carey, on January 20, 2005, the day after sentencing, Mr. Cordell called Mr. Carey at 4:15 in the afternoon. During this telephone conversation Mr. Cordell told Mr. Carey that he thought Mr. Carey had done a good job at the sentencing hearing. Mr. Cordell asked Mr. Carey what Mr. Carey thought about Mr. Cordell's right to appeal, a right which the Court had expressly advised Mr. Cordell he had to exercise within ten days. Mr. Carey explained to Mr. Cordell the nature of an appeal and that an appeal was simply not a process to have another judge decide what is an appropriate sentence but rather is a process if there is an error in the case. Mr. Carey told Mr. Cordell that when you plead guilty you admit the facts of your guilt and that because Mr. Cordell was successful in obtaining a sentence under the guidelines there were not any appealable grounds for relief. Mr. Carey testified that after he advised Mr. Cordell of the nature of an appeal and that there were no grounds for appeal in his case, Cordell told Mr. Carey that he understood and said "[T]hat's what I thought. I wanted to ask you about it, though." Mr. Carey went on to advise Cordell that if he wanted to reduce his sentence he should continue to work with the ATF and continue to cooperate. Mr. Carey advised Cordell that if he went ahead and appealed "all bets would be off" with regard to reducing his sentence because he would then be in an adversarial position with the Government. Notably, Mr. Carey expressly testified that "[A]t no time did Mr. Cordell, say ... I want you to go ahead and appeal it anyway. I don't like my sentence." Mr. Carey told Cordell that if Cordell wanted Mr. Carey to file an appeal that he would do so within ten days and that would be the last conversation that they would have with the

Government regarding cooperation. The next day Cordell telephoned Mr. Carey to inquire whether Cordell needed to stay in touch with pretrial services. Mr. Carey advised Cordell that all of the previous conditions of release remained in effect pending his voluntary surrender. There was no mention during this telephone conversation by Cordell regarding the filing of an appeal. After that discussion, and within the ten day period for filing an appeal, Cordell never contacted Mr. Carey again to advise that he had changed his mind and that he wanted Mr. Carey to file an appeal.

On January 25, 2005 Mr. Carey spoke with the prosecutor who advised he would file a Rule 35 motion if Cordell further cooperated. Later that some day Mr. Carey spoke with Special Agent Kreuger, who advised Mr. Carey that he believed Cordell had information concerning a stolen U-Haul truck with guns and that Cordell could provide assistance in the investigation.

There was no further contact from Cordell until June 7, 2005 when Cordell's son telephoned Mr. Carey to advise that Cordell wanted to be transferred to a medical facility. Mr. Carey advised Cordell's son that he should contact the Bureau of Prisons immediately. Significantly, there was no mention of an appeal or the status of an appeal during this conversation. Subsequently, on June 30, 2005 Cordell's daughter called Mr. Carey and told Mr. Carey that Cordell needed a lawyer to file a 2255 petition. Mr. Carey then spoke to Cordell's wife and told her that he could not represent Cordell in a 2255 petition and that if a hearing was set the magistrate judge would appoint counsel. That was Mr. Carey's last contact concerning this case.

## II. <u>LEGAL ANALYSIS</u>

A.  **Ineffective Assistance of Counsel Failure To File Notice of Appeal**

Claims of ineffective assistance of counsel are subject to the two-prong analysis set out by the Supreme Court in <u>Strickland v. Washington</u>.[4] To make out a successful claim, Petitioner must show (1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense.[5]

Although the right to appeal is not necessarily a constitutional right, there is little question that failure to pursue an appeal results in the denial of a proceeding altogether, thus implicating a denial of due process.[6]

In examining whether there is defective performance by counsel under the first prong of *Strickland* - where the claim of ineffective assistance of counsel, as here, is premised on the failure to file an appeal - the inquiry begins with the question of whether counsel consulted with the defendant about an appeal.[7] If counsel has discussed with the defendant the advantages and disadvantages of taking an appeal, and made a reasonable effort to discover the defendant's wishes, counsel performed in a professionally unreasonable manner only if counsel failed to follow the defendant's express instructions to file an appeal.[8] If it is determined that "counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary question: whether counsel's failure to consult with the defendant itself constitutes deficient

---

[4] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

[5] *Id.* at 687, 104 S.Ct. at 2064.

[6] <u>Martinez v. Court of Appeal of California</u>, 528 U.S. 152, 120 S.Ct. 684 (2000).

[7] <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 120 S.Ct. 1029 (2000).

[8] *Id.* at 528 U.S. 478, 120 S.Ct. 1035.

11

performance."[9] However, "counsel only has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing."[10]

Based on the evidence presented the Court determines that Petitioner has failed to show deficient performance by Mr. Carey because Mr. Carey "consulted" with the Petitioner and the weight of the evidence does not show Mr. Carey failed to follow the express instructions of the Petitioner to file an appeal.

Petitioner's claim is dependent upon his testimony that in the corridor outside of the courtroom directly after sentencing on January 20, 2005 he told Mr. Carey to file an appeal. Mr. Carey unequivocally testified that it never happened. Mr. Carey expressly recalls that he did not meet with Cordell after sentencing because on the day of sentencing Fletcher Peacock, the Federal Public Defender for the Middle District of Florida - and Mr. Carey's superior - was present and needed to leave the courthouse directly so that he could return to Orlando. While the Court recognizes that Cordell's testimony conflicts with Mr. Carey's, the Court concludes that based upon the Court's personal observation of the witnesses  - coupled with the fact that Cordell did not offer any details of the alleged meeting in the corridor in contrast to Mr. Carey's detailed recollection of the events that day - Cordell's testimony that he told Mr. Carey to appeal

---

[9] *Id.*

[10] *Id.* at 528 U.S. 480, 120 S.Ct. 1036.

directly after sentencing lacks any indicia of credibility. Accordingly, the Court finds that the testimony of Mr. Carey is to be credited and the testimony of Mr. Cordell with regard to whether he told Mr. Carey to file an appeal is simply not believable.  The Court, therefore, concludes that the evidence did not establish that Mr. Carey failed to follow the instructions of Mr. Cordell to file a notice of appeal.

The testimony concerning the telephone conversation between Mr. Carey and Cordell on January 20, 2005, the day after sentencing, further supports the Court's finding that Cordell did not instruct Mr. Carey to file a notice of appeal. Mr. Cordell never testified that he instructed Mr. Carey to file an appeal during this conversation. Nor did Cordell deny that during the January 20, 2005 telephone conversation Mr. Carey explained to Cordell the nature of an appeal, the likely outcome of an appeal and that an appeal would essentially eliminate his chances to continue to cooperate and further reduce his sentence. As such, the evidence established that Mr. Carey fulfilled his responsibility of consulting with the defendant concerning both the process of an appeal and the merits (or lack thereof) of grounds for an appeal and, thus, Mr. Carey adequately "consulted" with Mr. Cordell as required under *Roe v. Ortega*.[11]

Therefore, under *Roe v. Ortega* the only way in which Mr. Carey's conduct could be considered professionally unreasonable would be if Mr. Carey failed to follow the express instructions of Mr. Cordell. Mr. Carey testified that Mr. Cordell never instructed Mr. Carey to file an appeal during the January 20, 2005 telephone conversation. Rather, Mr. Cordell told Mr. Carey after being advised there were no grounds for an appeal -

---

[11] *Id.* 528 U.S. 478("We employ the term 'consult' to convey a specific meaning –advising the defendant about the advantages and disadvantages of taking an appeal ...").

and after being advised that pursuing an appeal would adversely affect Cordell's ability to continue to cooperate - that he understood. Lastly, there was no evidence presented that Mr. Cordell ever made further inquiry with Mr. Carey concerning the status of an appeal. Had Mr. Cordell instructed his counsel to file an appeal, simple logic dictates that he would have contacted Mr. Carey at some point to determine the status of his appeal.

Accordingly, the Court concludes that Mr. Carey properly consulted with Cordell concerning an appeal and Mr. Carey never failed to follow express instructions by Mr. Cordell to file an appeal - either immediately after sentencing - or during the telephonic consultation between Mr. Carey and Mr. Cordell on January 20, 2005.

Accordingly, for these reasons the Court concludes that the Petitioner has failed to establish deficient performance by his counsel under the performance prong of *Strickland* and, therefore, Petitioner's motion to vacate his judgment of conviction on this ground is due to be denied.

**B.  Petitioner's Remaining Claims Are Without Merit**

Although, the evidentiary hearing was limited to the issue of whether Mr. Cordell received ineffective assistance of counsel because of the failure to file a notice of appeal, Petitioner's § 2255 petition raised several other claims, all of which are legally frivolous or are refuted by the record.

For example, Petitioner claims that: (1) his plea was involuntary and that he lied concerning the factual basis for the offense; his medication affected his ability to understand the proceedings and that he did not understand the elements of the offense; (2) the Court should not have accepted his guilty plea because it was entered into in the

14

interim between *Blakely v. Washington*[12] and *United States v. Booker*[13] believing that the sentencing guidelines would be applied to his case; and (3) his attorney rendered ineffective assistance with regard to the factual and legal defenses by refusing to investigate the case, and by failing to object to the inclusion of prior convictions with regard to the calculation of the criminal history points under the guidelines.

With regard to Cordell's factual claims concerning his change of plea hearing, each of these claims are directly contrary to the sworn testimony Cordell provided to the Court during the plea colloquy.[14]

With regard to Cordell's claims that his attorney performed deficiently at sentencing by failing to challenge the inclusion of prior convictions in calculating his criminal history points, the prior convictions were specifically charged in the indictment and Cordell admitted the prior convictions under oath at the change of plea hearing.

Lastly, Cordell's claim that there was error as a result of *Booker*, is frivolous in view of the fact that Defendant was sentenced pursuant to the advisory guidelines as required by *Booker*.

## III. <u>RECOMMENDATION</u>

In view of the foregoing it is respectfully **RECOMMENDED** that Petitioner's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody (Doc. 1) should be **DENIED**.

---

[12] 124 S.Ct. 2531 (2004).

[13] 125 S.Ct. 738 (2005).

[14] Doc. 43, transcript of change of plea hearing dated June 22, 2004.

**IN CHAMBERS** at Ocala, Florida this 24th day of July, 2006.


GARY R. JONES
United States Magistrate Judge

Copies to:
      Honorable Wm. Terrell Hodges
      Senior United States District Judge

      United States (Bodnar)
      Counsel for Defendant
      Defendant